[L. A. No. 9457. In Bank.—April 26, 1927.]

BRAUN, BRYANT & AUSTIN (a Corporation), Petitioner, v. HUGH J. McGUIRE et al., Members of the Board of Public Works of the City of Los Angeles, Respondents.

[1] PATENTS—RIGHTS CONFERRED BY.—Patents issued by the United States under the acts of Congress passed pursuant to section 8 of article I of the constitution grant to the patentees three separate and distinct rights, to wit: the right "to make," the right "to use," and the right "to vend" the patented articles.

1. See 20 R. C. L. 1187.

[2] ID.—ASSIGNMENT OF RIGHT TO USE PATENTED ARTICLE—RIGHT TO MANUFACTURE.—The right to make a patented article, being a separate and distinct right in the hands of the patentee and severable from the right to the use, does not pass by assignment of the right to the use unless the license to use would otherwise not benefit the licensee.

[3] ID.— STREET PAVING — RIGHT TO USE PATENTED MATERIAL — STREET IMPROVEMENT ACT OF 1911—COMPETITIVE BIDDING.—The right in this state to use patented articles in street and other improvement proceedings which may be authorized by statute cannot be questioned; and under the Improvement Act of 1911 the pavement of streets as therein contemplated may be accomplished by the use of paving materials "whether patented or not"; and it is well settled that the specified use of patented paving materials in proceedings taken under said act does not affect competition where the owner of the patent rights stipulates with the city that the patented article will be furnished to the successful bidder without reservation at a fixed price.

[4] ID.—LOS ANGELES CHARTER — CONSTRUCTION — RIGHT TO USE MANUFACTURED ARTICLE — RIGHT TO MANUFACTURE. — The provision of the charter of the City of Los Angeles that, before any pavement protected by letters patent shall be ordered by the city, the owner of the patent rights shall enter into an agreement with the city transferring to the city all right "to the use" of the patented paving material within the city, upon the terms and conditions set forth in the agreement, does not, expressly or impliedly, require the transfer of the right to manufacture such patented material.

[5] ID.—CHARTERS — STATUTORY CONSTRUCTION. — The provisions of city charters are subject to the same rule of interpretation as a statute, and if they be free from ambiguity, no construction or interpretation is required or permitted, and they must be given no meaning other than their words import.

[6] ID.—CONSTRUCTION OF LOS ANGELES CHARTER—USE OF PATENTED MATERIAL—BIDDERS.—From a liberal construction of the provision of the charter of the city of Los Angeles with reference to the use of patented materials in street paving, the utmost that can be said of it is that it was designed to make said patented paving materials available to all bidders for the contract at a fixed and uniform price, and said purpose is accomplished when by the written stipulation of the patentee or his licensee the patented material is made available to all bidders at such price.

3.   See 19 Cal. Jur. 181.
5.   See 18 Cal. Jur. 769.

[7] ID.—LICENSE AGREEMENT—CONFORMITY TO CHARTER.—It is held in this proceeding that in so far as said charter provision may be said to apply to the special proceeding in question, the license agreement is in compliance therewith.

(1) 30 **Cyc.**, p. 817, n. 15, p. 972, n. 90.   (2) 30 **Cyc.**, p. 956, n. 83. (3) 28 **Cyc.**, p. 1027, n. 64.   (4) 28 **Cyc.**, p. 1027, n. 64.   (5) 43 **C. J.**, p. 194, n. 84, p. 199, n. 41; 30 **Cyc.**, p. 958, n. 5; 36 **Cyc.**, p. 1107, n. 31, 32, p. 1115, n. 97, 98.   (6) 28 **Cyc.**, p. 1027, n. 64. (7) 28 **Cyc.**, p. 1027, n. 64.

PROCEEDING in Mandamus to compel the Board of Public Works of Los Angeles to execute a contract for street paving.   Granted.

The facts are stated in the opinion of the court.

E. R. Young, Arthur M. Ellis, Roscoe W. Griffin and Paul S. Honberger for Petitioner.

Jess E. Stephens, City Attorney, and Herman Mohr, Deputy City Attorney, for Respondents.

Wm. J. Locke, Charles N. Kirkbride, H. C. Symonds, Everett W. Mattoon, County Counsel, and J. H. O'Connor, Assistant County Counsel, Amici Curiae.

SHENK, J.—This is an application for a writ of mandate to compel the respondents, as members of and constituting the board of public works of the city of Los Angeles, to execute a contract for the improvement of certain streets and to pass upon the form and sufficiency of the bonds required in connection with said contract.

On the fourth day of September, 1925, the city council commenced proceedings to improve Orlando and other streets, electing to proceed under the provisions of the Improvement Act of 1911 (Stats. 1911, p. 730). The requirements of the statute were complied with and the petitioner was awarded the contract for the improvement of said streets, which was the paving thereof. Thereafter, on December 14, 1925, the petitioner presented a contract in due form, together with the necessary bonds, to the respondents for execution and approval. The respondents refused to execute and approve the same on the ground that they

entertained doubt as to whether the requirements of subdivision (10) of section 3 of the city charter with reference to the use of patented paving material had been fully complied with. Hence this proceeding.

The street improvements in question contemplate the use of a patented paving material known as the National Pavement Wearing Surface, the letters patent of which are owned by the National Pavements Corporation of California, a corporation. The city charter, in section 386 thereof, contains a general authorization to the city to enter into contracts for the purchase of articles covered by letters patent granted by the United States without competitive bidding, but with reference to the use of patented paving material the charter contains the following special provision:

"No pavement protected by any patent, trade-mark, trade name, copyrighted name, or any device which tends to prevent competitive bidding, shall be ordered by the city, until the owner thereof has entered into a written agreement with the city transferring to the city all right to the use of the same within the city upon the terms and conditions set forth therein. The city shall not be bound by any such agreement unless the same shall have been approved by the Board of Public Works, two-thirds vote of the Council, and the Mayor, and executed by the Mayor on behalf of the city. No such agreement. shall be for a longer period than five years.

"Whenever the city shall let a contract for the construction of any such pavement the contractor therefor shall pay to the city the exact sum or royalty which the city is required to pay under its said agreement.

"Whenever the city shall construct any such pavement by the direct employment of labor and purchase of materials, the costs of which are chargeable upon the property in a special assessment district, the exact sum or royalty which the city is required to pay under said agreement shall be added to and included in the costs chargeable to the property in said special assessment district." (Charter, art. I, sec. 3, subd. [10], Stats. 1925, p. 1037.)

With the requirements of the foregoing charter provision in view, the National Pavements Corporation of California, on July 21, 1925, executed what is called a National Pave-

ments License Mixture Agreement. This agreement, so far as material here, provides that whereas it is deemed advisable by the proper authorities of the city of Los Angeles that certain streets in the city be paved with National Pavements in accordance with specifications numbered 129, new series (wherein this and other patented paving materials are specified for street paving), and that competitive bidding is deemed advisable, and that whereas said corporation is the owner of all the patents and processes covering such National Pavements wearing surface in the state of California: "Now, therefore, National Pavements Corporation of California hereby agrees to transfer, and does transfer to the City of Los Angeles all right to the use of said patented pavement and all of the patents, trade marks, trade names and copyrighted names now owned, or which may be hereafter owned by said National Pavements Corporation of California, necessary to the use of the said National Pavements pavement constructed in accordance with said specifications, and pursuant to this agreement. And for the consideration hereinafter named, and in and for the consideration of the adoption by the City Council of the City of Los Angeles of Resolution or Ordinance of Intention, and such other proceedings as may be necessary to provide for the improvement of any one or more of the said streets, avenues, boulevards, places, courts, public ways, rights of way, lanes, alleys, and properties, in said city, or forming a part of the boundaries thereof, whether lying within or without said city, in accordance with the above named specifications, National Pavements Corporation of California hereby proposes and agrees to furnish to the City of Los Angeles for all work or improvement of paving any one or more of the said streets, avenues, boulevards, places, courts, public ways, rights of way, lanes, alleys, and properties, in said city, or forming a part of the boundaries thereof, whether lying within or without said city, with said National Pavements pavement, and to any contractor to whom may be awarded the contract for such work or improvement and to the owners of lots and lands proposed to be assessed for said work or improvement who may elect to take the work and enter into a contract to perform the same as 'contracting owners,' and for which an Ordinance or resolution of Intention has been regularly adopted by the City Council of said City of Los

Angeles at any time within four (4) months from date hereof, or at any time thereafter until this offer is withdrawn by the undersigned by a thirty (30) day written notice filed with the City Council of the City of Los Angeles, the following material manufactured and mixed ready for laying as specified and required under and by said specifications, and services, with the right to use any or all of the patents, trade marks, or trade names now owned or which may be hereafter owned by said National Pavements Corporation of California, necessary to lay said pavements:'' The material specified in the agreement is described as ''the necessary paving mixture for the wearing surface prepared under the patents and processes of National Pavements Corporation of California and in accordance with the said specifications of the city of Los Angeles above referred to, delivered at the temperature specified in said specificatons in wagons or trucks of the contractor or purchasers of said mixture at National Pavements mixing plant in the City of Los Angeles.'' It is also provided that an expert whose time and expenses will be paid for by National Pavements Corporation will be furnished to the purchaser of said mixture at the expense of the corporation, and frequent tests of the mixture will be made by said expert so as to insure uniformity and best results. The prices at which the material may be obtained by any successful bidder are fixed at from nine cents to eleven and one-half cents per square foot of wearing surface, according to thickness. The term of the agreement is fixed at five years from its date. The agreement then provides: ''The execution of any work or improvement by the successful bidder or 'contracting owners' and the City of Los Angeles, or department thereof, shall be deemed by the said National Pavements Corporation of California to be an acceptance of this proposal by the City of Los Angeles and. shall bind the undersigned National Pavements Corporation of California to furnish said rights, materials and services to whom the contract to perform the work or improvement contemplated in the said Ordinance or resolution of Intention is let.'' · The agreement was duly executed by the National Pavements Corporation of California, was approved by a majority vote of the board of public works, by a two-thirds vote of the city council, and was executed on behalf of the

city by its mayor as required by the foregoing charter provision.

As disclosed by their verified answer the respondents contend that said charter provision requires the license agreement to transfer not only the right to "use" the patented material, but also "to make available to all contractors engaged in public improvement work and who desire to bid and enter into contracts for such work, a similar right to manufacture, sell and lay such patented pavement." The transfer of the right to sell is not now pressed but it is particularly urged that the right to "use" as that word is employed in the charter provision includes the right to "manufacture."

[1] Section 8 of article I of the constitution of the United States provides that the Congress shall have power to promote the progress of science by securing for limited times to inventors the exclusive right to their inventions. In pursuance of this constitutional provision Congress has provided, among other things, that there shall be granted to the patentee, his heirs or assigns, for the term of seventeen years, the exclusive right to make, use, and vend the patented article throughout the United States (U. S. Comp. Stats. 1916, sec. 9428; Rev. Stats., sec. 4884). The patent, therefore, grants to the patentee three exclusive rights; first, "to make," second "to use," and third, "to vend" the patented article. That the holder of a patent has these three separate and distinct rights was declared by the supreme court of the United States in *Adams* v. *Burke,* 17 Wall. (U. S.) 456 [21 L. Ed. 700, see, also, Rose's U. S. Notes]. It was there said: "The right to manufacture, the right to sell and the right to use are each substantive rights and may be granted or conferred separately by the pat-. entee." The rule is stated with a citation of numerous later authorities in 20 R. C. L., at page 1187, as follows: "The patentee is secured in the right of making, the right of using, and the right of selling, the patented article; and any one of these privileges may be the subject of license." An infringement may consist in either making, using, or selling the patented article, or in all three thereof, without authority (30 Cyc. 972). Cases are cited by the respondents to the effect that the license to "use" includes the right to "make." Generally, it may be said of these cases

that they involve the construction of license agreements between private parties where the intention is the important element, or have arisen under laws the construction of which prompted the holding that the right to "make" was necessarily or reasonably implied from a grant of the right to "use." The rule in such cases is subject to the very important limitation included in the statement of Mr. Hopkins in his work on Patents as follows: "A license to 'use' implies the right to make for use, where otherwise the license would not benefit the licensee." (Hopkins on Patents, vol. 1, sec. 234; see Walker on Patents, sec. 296.) As illustrative of the cases in which the particular facts or circumstances evidence an intention that the right to make is included in the right to use in order that the licensee may have the benefit of the license is the case of *Dunkley Co.* v. *California Packing Co.,* 277 Fed. 996, where it was held, quoting from *Edison etc. Co.* v. *Peninsula L. P. & H. Co.,* 95 Fed. 669: "If the circumstances indicate such an intention a license to use implies a license to make the thing to be used." That case involved the right to make and use patented fruit peeling machines. The grant to the licensee was the "free right for the use of any machine or machines or inventions owned or controlled by" the grantor. After stating the facts the court concluded that "every circumstance points to the conclusion that his [the grantor's] licensee was expected to make or have made whatever machines it desired to use." It appeared in that case that the grantor of the licensee had suspended business and that unless the licensee possessed the right to make the machines the license would be of no use to it. The control of the right to manufacture the patented article would seem in many cases to be of the very essence of the patentee's beneficial interest. The value of the article on the market and its continuing marketability may depend on whether it is manufactured according to the plan or formula specified in the patent. If the purchaser of the right to use the article also as matter of law thereby acquires the right to make the same any deviation from the specified plan or formula, at the option of the licensee and for reasons of economy or otherwise, might result in the fabrication of an inferior article or product and completely destroy its standing in the avenues of trade. [2] An examination of the authori-

ties on the subject satisfies us that the correct rule is that
the right to make a patented article, being a separate and
distinct right in the hands of the patentee and severable
from the right to the use, does not pass by assignment of
the right to the use unless the license to use would other-
wise not benefit the licensee.

[3] The subject of the purchase of patented articles
by municipalities in this state has received consideration in
several cases. (*Nicholson Pavement Co.* v. *Painter*, 35 Cal.
699; *Dunn* v. *Altschul*, 57 Cal. 474; *Perine* v. *Quackenbush*,
104 Cal. 684 [38 Pac. 533]; *Sarver* v. *Los Angeles*, 156
Cal. 187 [103 Pac. 917]; *Vale* v. *Boyle*, 179 Cal. 180 [175
Pac. 787]; *Warren Bros.* v. *Boyle*, 42 Cal. App. 246 [183
Pac. 706]; *Woodworth* v. *Sebastopol*, 72 Cal. App. 187 [236
Pac. 981].) The right in this state to use patented articles
in street and other improvement proceedings which may
be authorized by statute cannot be questioned. With refer-
ence to the use of patented paving material it is specifically
provided in the Improvement Act of 1911 (Stats. 1911,
p. 730) that the pavement of streets as therein contemplated
may be accomplished by the use of paving material "whether
patented or not" (sec. 79, subd. sixth), and it is well
settled that the specified use of patented paving materials
in proceedings taken under said act does not affect com-
petition where the owner of the patent rights stipulates
with the city that the patented article will be furnished
to the successful bidder without reservation at a fixed price
(*Woodworth* v. *Sebastopol*, *supra*; *Miller* v. *Sebastopol*, 72
Cal. App. 187 [241 Pac. 593]). It is obvious, therefore,
that the special Los Angeles charter provision has provoked
the present controversy, and the proper interpretation
thereof is the only matter involved in this proceeding.

[4] When we approach the Los Angeles provision in the
light of the foregoing considerations we find that it is
therein required that before any pavement protected by let-
ters patent, etc., shall be ordered by the city the owner
of the patent rights shall enter "into an agreement with
the city" transferring to the city "all right to the use"
of the patented paving material within the city "upon the
terms and conditions" set forth in the agreement. The
terms and conditions to be specified in the agreement are
safeguarded by the requirements that the agreement "be

approved by a majority vote of the Board of Public Works, two-thirds vote of the Council and the Mayor,'' which requirements were complied with in this case. No reference is made in the charter to the transfer of the right to manufacture. A determination that the owner of the patent must in said agreement specifically transfer to the city the right to manufacture the patented article would be justified only on the theory that the charter provision so requires. It does not do so in express language and we find no expression therein which would support the conclusion that it does so by necessary or reasonable implication. [5] The charter provision is, of course, subject to the same rules of interpretation as a statute. If it be free from ambiguity no construction or interpretation is required or permissible and it must be given no meaning other than its words import. ''It is a cardinal rule applicable to the interpretation of statutes that in order to ascertain the intent of the legislature in enacting the same, recourse must first be had to the language of the statute itself; and that if the words of enactment given their ordinary and proper signification are reasonably free from ambiguity and uncertainty, the courts will look no further to ascertain its meaning.'' (*People* v. *Stanley,* 193 Cal. 428, 431 [225 Pac. 1, 2].) In the construction of the instrument the office of the court ''is simply to ascertain what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted'' (Code Civ. Proc., sec. 1858; 23 Cal. Jur. 729). What the respondents are urging the court to do is to declare that when the charter says ''to use'' it means ''to use and manufacture.'' It is insisted that we ought so to do on the ground that the language of the charter evidences that intention. We fail to find in the language employed any evidence of such intention. To interpolate the words ''to manufacture'' would do violence to universally recognized rules of statutory construction. As above stated it could only be justified on the theory that the words ''to use'' as employed mean ''to use and manufacture'' as a matter of law. In view of the separate and severable assignable interests of the patentee in the invention it cannot be so held under the circumstances here presented.

For the purpose of indicating circumstances which might justify the court in so holding, the respondents in their answer allege that if the city or any successful bidder or the property owners in the assessment district are to receive any substantial benefits from the requirements of the charter provision it must be held that the right "to use" includes the right "to manufacture." It is alleged that the petitioner and many other contractors engaged in the paving contracting business "own, possess or control various paving mixtures patented or otherwise protected under the laws of the United States, or possess an exclusive right and license for the use of such patents and such patented paving mixtures"; that the petitioner and such other contractors possessing such rights are enabled to charge and exact from property owners and others required to pay assessments for street paving excessive and exorbitant amounts for the use of such patented paving material, and that the specification of such materials in assessment work without a license agreement to make and use the patented materials results in the creation of a monopoly and of the opportunity to charge unfair, unreasonable, and exorbitant prices for such pavements, and further results in favoritism in the securing of contracts and prevents competition at the expense of property owners who are assessed and required to pay for such patented paving. It may be that the framers of the charter provision had in mind the prevention or correction of some or all of the alleged abuses. If so the question arises, was the result fully accomplished by the particular charter provision adopted? For aught that appears in the record herein it would seem that in so far as the charter provision and the license agreement executed pursuant thereto make available to the city and all bidders on such public work the use of such patented material at a fixed and uniform price the purpose has been accomplished. If the full purpose suggested by respondents has not been accomplished it may be noted that there appears to be no obligation on the part of the city to specify such patented material to be used in work to be done either by the city itself or under the assessment district plan. There is likewise no compulsion on the part of property owners to petition for any particular kind of patented pavement as was done in this case, and if the board of public works

should conclude upon the consideration of the bids that the prices specified by the bidder are unfair or exorbitant or the proceeding is tainted with favoritism it has the power under the statute to reject any and all bids should it deem this for the public good (sec. 10, Stats. 1911, p. 735).

The respondents state that in framing the said charter provision the board of freeholders had before it the provisions of the charter of the city and county of San Francisco and the case of *Warren Bros. Co.* v. *Boyle*, 42 Cal. App. 246 [183 Pac. 706], wherein it was held that a license agreement transferring to said city and county the right to "use" a patented paving material, and which the owner agreed to furnish the city and county at a cost to the city of seven dollars per ton for the patented wearing surface, was a sufficient compliance with the following charter provision: "No patented pavement shall be ordered during the existence of the patent therefor, until the owner of such patent shall have transferred to the city and county all right to the use of the same therein, with the privilege to any person to manufacture and lay the same upon the streets under any contract that may be awarded to him by the city and county." It is earnestly insisted by the respondents that under that case it must now be held that the transfer of the right to use includes the transfer of the right to manufacture. We cannot accede to this contention. It will be noted that the San Francisco charter specifically requires that the license agreement transfer "the privilege to any person to manufacture" the patented pavement "under any contract that may be awarded to him by the city and county." The said charter provision does not seem to require the transfer to the city and county of the right to manufacture the patented article when the city is doing the work through its own instrumentalities and not through the medium of a contractor. In the case relied upon the city and county was proceeding to repave an accepted street, the cost thereof to be paid from a fund in the city treasury and not from an assessment under the district plan. It was properly held that the transfer of the right to use the material delivered to the city at a specified price per ton for said improvement was sufficient compliance with the charter provision. The license agreement involved in that case was in its recitals made par-

201 Cal.—10

ticularly applicable to the improvement of the accepted street in question. The language of the San Francisco charter when considered in the light of the limitations incident to the proceeding in that case, that is to say, the absence of any charter requirement of the transfer to the city of the right to manufacture when the city itself was performing and paying for the work, serves to accentuate the observation that if the framers of the Los Angeles charter provision had intended to include therein the requirements of a transfer either to the city or to a successful bidder of the right to manufacture they could and should have done so in no uncertain terms or in terms that would admit of no other reasonable construction. The fact that they did not do so is persuasive that it was not intended that the additional right was required to be transferred.

It is further stated by the respondents that the framers of the Los Angeles charter provision had in mind the ruling of the supreme court of Wisconsin in the case of *Allen* v. *Milwaukee,* 128 Wis. 678 [116 Am. St. Rep. 54, 8 Ann. Cas. 392, 5 L. R. A. (N. S.) 680, 106 N. W. 1099]. In that case the city of Milwaukee was proceeding to pave a city street through the medium of a contractor after advertisement for bids. The specifications called minutely for the use of specially named patented paving material. A taxpayer succeeded in enjoining the city and the contractor from carrying out the contract on the ground that such a proceeding was unauthorized under the laws of that state. The proceedings were taken and the controversy arose after the adoption of a statute in 1903 imposing a prohibition on any city to the effect that no special brand of asphalt should be required by name to be furnished in any specifications for street paving. Waiving this statutory prohibition, and notwithstanding the same, the court declared that nearly forty years theretofore said court in *Dean* v. *Charlton,* 23 Wis. 590 [99 Am. Dec. 205], had decided that when charters gave power to cities to impose by special assessment the cost of street improvements only by competitive bids such cities had no power to specify a patented pavement so controlled by a monopoly that there could be no competition in the fair and reasonable meaning of the word, and that during all of those years the legislature had approved the construction of such grants by re-

enacting them in substantially the same form.    The case of *Dean* v. *Charlton* was decided in 1869.    It was therein directly decided that where a city was empowered by its charter to improve streets at the expense of the adjoining property owners and was required to let such work to the lowest bidder, it could not contract for the laying of a pavement the right to which was patented and owned by one firm.    The dissenting opinion of Chief Justice Dixon in that case points out that pending a motion for a rehearing the supreme court of Michigan, in an opinion by Chief Justice Cooley (*Hobart* v. *City of Detroit,* 17 Mich. 146 [97 Am. Dec. 185]), had reached an opposite conclusion in the construction of identical statutory language.    It is obvious that the holding in *Allen* v. *Milwaukee, supra,* in 1906, affirming the conclusion of the same court in *Dean* v. *Charlton,* was based upon an early statute of Wisconsin which prohibited the specification of patented pavement in assessment proceedings for street improvements, and when there had been no substantial change in the statutory law of the state in the intervening years.    The case of *Allen* v. *Milwaukee, supra,* may therefore be considered only in its relation to the particular laws of Wisconsin, which had been in effect for nearly forty years, and cannot be deemed of any controlling importance in the construction of laws of this state, where, under the Improvement Act of 1911, the use of patented pavement in such proceedings is specifically authorized.    The use of such material as so authorized by our statute has been held not to prevent competitive bidding in the presence of a license agreement such as the one here involved (*Woodward* v. *Sebastopol, supra; Miller* v. *Sebastopol, supra*).    It is pointed out by petitioner that similar license agreements have been attacked and sustained by numerous state courts as not preventing competitive bidding. (*Farmer* v. *Dahl,* 19 Ariz. 395 [171 Pac. 130]; *Sanborn* v. *City of Boulder,* 74 Colo. 358 [221 Pac. 1077]; *McEwen* v. *City of Coeur d'Alene,* 23 Idaho, 746 [132 Pac. 308]; *Tousey* v. *Indianapolis,* 175 Ind. 295 [94 N. E. 225]; *Saunders* v. *Iowa City,* 132 Iowa, 132 [9 L. R. A. (N. S.) 392, 111 N. W. 529]; *Pollock* v. *Kansas City,* 87 Kan. 205 [42 L. R. A. (N. S.) 465, 123 Pac. 985]; *La Coste* v. *New Orleans,* 119 La. 470 [44 South. 267]; *Baltimore* v. *Flack,* 104 Md. 107 [64 Atl. 702]; *Ford* v. *Great Falls,*

46 Mont. 292 [127 Pac. 1004]; *Wurdeman* v. *City of Columbus,* 100 Neb. 134 [158 N. W. 924]; *Hastings* v. *Columbus,* 42 Ohio St. 585; *Reed* v· *Rockliff Gibson, etc.,* 25 Okl. 633 [138 Am. St. Rep. 937, 107 Pac. 168]; *Johns* v. *City of Pendleton,* 66 Or. 182 [Ann. Cas. 1915B, 454, 46 L. R. A. (N. S.) 990, 134 Pac. 312]; *Sherrett* v. *Portland,* 75 Or. 449 [147 Pac. 382]; *Wagoner* v. *City of La Grand,* 89 Or. 192 [173 Pac. 305]; *Great Northern, etc.,* v. *Leavenworth,* 81 Wash. 511 [Ann. Cas. 1916D, 239, 142 Pac. 1155].) Conceding some contrariety of authority on the effect of such an agreement, it is clear that the better reasoned cases recognize the distinction between contracts where the owner of the patented article stipulates to furnish the same to any bidder and cases where the contract is sought to be let without any stipulation on the part of the owner of the patent to supply it to all bidders at a fixed price.

In further support of their contention that it was intended by the said charter provision that the municipal authorities should be limited in the specification of patented pavement to the acquisition of "an unlimited license," which in the language of the answer would include the right on the part of the contractor "to manufacture, sell and lay such patented pavement," it is urged by respondents that unless the successful bidder has the right to make the paving material no benefit would accrue from the right to use the same, as anyone could purchase the material and with the purchase the right to use it would necessarily follow. It may be assumed that the self-interest of the owner of a patented article would prompt him to market his product notwithstanding his legal right to withhold it from the market or to refuse to sell it to anyone (*Heaton-Peninsula etc. Co.* v. *Eureka Utility Co.,* 77 Fed. 288, 294 [35 L. R. A. 728]). When he elects to place the article on the market it is his right to fix the price to be paid for it. When he seeks to sell it to the city and the city desires to purchase it the transaction may take place, as above noted, without publication of notice inviting proposals and the letting of the contract to the lowest bidder (Charter, sec. 386), unless the article be patented paving material as provided in said subdivision (10). Finally, just what, then, does that subdivision require the owner of the patent to do in order that he may sell his product to the city? The

first paragraph imposes upon him the obligation to transfer to the city all right to the use of the patented material ordered. The second paragraph, in terms, imposes no duty on the owner of the patent, but relates to the duties of the contractor in his relation as such with the city. The third paragraph does not relate to any obligation imposed on the owner of the patent nor to any duty imposed on the contractor, but provides that the cost of the material to the city under the license agreement "shall be added to and included in the costs chargeable to the property" in the assessment district, with the specification that such costs shall be so added and included "whenever the city shall construct any such pavement by the direct employment of labor and purchase of material, the costs of which are chargeable upon the property in the special assessment district." Taken as a whole the subdivision would seem to contemplate that the license agreement fix the price at which the material would be furnished or to fix the royalty to be paid by the city for the use of the same. In the second paragraph it is provided that the contractor pay to the city "the exact sum or royalty" which the city is required to pay under the agreement, and in the third paragraph it is provided that the said "exact sum or royalty" be included in the costs chargeable to the property in said special assessment district when the pavement is laid by the city "by the direct employment of labor and purchase of material." The words "sum" and "royalty" obviously do not refer to the same exact item of expense. The "sum" to be paid to the owner of the patent in one case might readily be in excess of any "royalty" to be paid in another case and *vice versa*. Just how this charter provision taken as a whole or as to its separate paragraphs was intended to dovetail into and supplement the requirements of the several statutes authorizing paving improvements by special assessment, and particularly, as in the present case, the Improvement Act of 1911, presents a difficult problem. The 1911 act contemplates an improvement through the medium of a contractor after advertisement for bids or by the property owners themselves as "contracting owners," and where the cost thereof may be assessed against the property in the district. We find in the provisions of the act no authority for a special assessment when the improvement has

been constructed by the city by "direct employment of labor and purchase of material." Yet it seems that it is only when the city is so proceeding that "the exact sum or royalty" to be paid by the city to the owner of the patent may be included in the special assessment. If, when the city is proceeding as the agent of the property owners through the medium of a contractor, as in this case, and not by the direct employment of labor and purchase of material, the amount representing the exact sum or royalty cannot be included in the special assessment, but must be paid by the city as a contribution towards the cost of the improvement, then it appears that no such contribution was provided for in the ordinance of intention, and we would not be justified in assuming that the cost of such patented material could be included in the assessment as an incidental expense. These are some of the considerations which move us to conclude that if the charter provision was intended to apply to a street proceeding, such as the one now in question and to the extent contended for by respondents, the said provision was inexpertly framed and does not fully accomplish the purpose intended. [6] As the result of any liberal construction that may be placed on the charter provision the utmost that can be said of it is that it was designed to make the said patented paving material available to all bidders for the contract at a fixed and uniform price. Said purpose would seem to be accomplished when by the written stipulation of the patentee or his licensee the patented material is made available to all bidders at such price. When the price is so fixed and is available to every bidder the bids may then be submitted on the basis of the same price to all.

[7] The respondents urge that in other respects the said license agreement is not in accordance with the charter requirements. We are of the opinion, however, that in so far as the charter provision may be said to apply to the special proceeding in question the license agreement is in compliance therewith.

It is alleged in the petition that numerous paving materials protected by patents, trademarks, trade names and copyrighted names have been used by the city of Los Angeles; that numerous materials and articles protected by patents, etc., other than paving materials so protected, are

now being specified and used by said city in the construction and improvement of streets, such as ornamental lighting systems, patented interlocking brick, patented cement sewer-pipe, vitrified pipe, sewer-flushing devices and many other materials and devices; that no license agreement relative to the use of any such articles or materials so protected by letters patent, etc., has been or is required by the city; that during the year 1925 patented lighting posts and equipment were installed by the city of Los Angeles at a cost aggregating more than two and one-half million dollars, and that the owners of the patents on such lighting posts and equipment are not required by the charter of the city to execute a license agreement such as is imposed on the owners of patented paving material. These allegations are not denied by the respondents, and the petitioner predicates thereon an argument that said subdivision (10) of section 3 of the Charter is unconstitutional for the reason that the same constitutes an unjust and unreasonable and unlawful discrimination against the owners of patented paving materials, entitled under the law to sell their goods, and in favor of owners of patents on other articles and materials purchased by the city. We deem it unnecessary to pass upon the points thus urged for the reason that we have concluded that the license agreement in question is in compliance with the charter provision as above indicated. Other points made by the respective parties have been considered. In view of what has been decided we also deem it unnecessary to mention or to pass upon them specifically.

Let the peremptory writ issue as prayed.

Seawell, J., Richards, J., Curtis., J., Preston, J., Langdon, J., and Waste, C. J., concurred.